## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>**LAWRENCE D WRIGHT**, and<br>**ANN MARIE WRIGHT, DECEASED**,<br><br>Debtors. | Case No. **05-61714-7** |
| **OLYMPIC COAST INVESTMENT, INC.,**<br>**A WASHINGTON CORP**,<br><br>Plaintiff.<br><br>-vs-<br><br>**ANN MARIE WRIGHT**[1] and<br>**LAWRENCE D. WRIGHT**,<br><br>Defendants. | Adv No. **06-00041** |

## MEMORANDUM   OF   DECISION

At Butte in said District this 29th day of March, 2007.

In this adversary proceeding Plaintiff Olympic Coast Investment ("OCI") seeks denial of

Defendants/Debtors' discharge under 11 U.S.C. §§ 727(a)(3), (a)(4)(A) and (a)(5).  The Court

held the trial in this proceeding, after due notice, at Great Falls on November 21, 2006, after

which the Court allowed the parties to submit briefs.  For the reasons set forth below, the Court

---

[1] The Defendants' attorney filed a Notice in the above-captioned Chapter 7 bankruptcy case on January 2, 2007, (Docket No. 74) stating that Ann Marie Wright died on December 29, 2006.

1

will enter a separate Judgment for the Defendants dismissing OCI's complaint.

A proposed Pretrial Order was submitted by the parties on November 20, 2006, and approved by the Court prior to the commencement of trial, with the exception of agreed fact No. 18 which was stricken.  OCI was represented at trial by attorneys Andrew W. Pierce ("Pierce") and Quentin M. Rhoades of Sullivan, Tabaracci & Rhoades of Missoula, Montana.  The Defendants Lawrence D. Wright ("Larry") and Ann Marie Wright ("Ann") (together "Wrights", "Defendants" or "Debtors") both appeared at trial and testified, represented by attorney Gary S. Deschenes of Great Falls, Montana.  Larry's former employee and owner of the insurance agency Solutions 4 Insurance ("S4I") Delores Collier ("Collier") also testified.  Plaintiff's Exhibits ("Ex.") 1, 2, 2-33, 3-1, 3-2, 3-3, 3-4, 4-1, 4-2, 4-3, 4-4, 4-5, 4-6, 4-7, 4-8, 5-1, 5-2, 5-3, 5-4, 5-5, 5-6, 5-7, 5-8, 5-9, 5-10, 5-11, 5-12, 6-1, 6-2, 6-3, 6-4, 6-5, 7-1, 7-2, 7-3, 7-4, 7-5, 7-6, 7-7, 7-8, 7-25, 7-34, 7-53, 7-54, 7-55, 7-56, 7-66, 7-67, 7-72, 7-71, 7-73, 7-76, 7-93, 7-104, 7-105, 8, and Defendants' Ex. A, B, C, D, E, F, G, and H, all were admitted into evidence without objection. At OCI's request the Court took judicial notice of the above-captioned Case No. 05-61714-7, and Wrights' prior Chapter 11 Case No. 99-43165-11[2].  At the conclusion of the Plaintiff's case-in-chief the Defendants moved for judgment on the grounds that Plaintiff failed to make a prima facie showing under §§ 727(a)(3), (a)(4) or (a)(5).  The Court heard argument and took Defendants' motion for judgment under advisement.  After the Defendants completed their case-in-chief the Court granted the parties time to file simultaneous briefs, after which the Court took this matter under advisement.  The parties' briefs have been filed and reviewed together with the

---

[2] The Chapter 11 case was dismissed on Wrights' motion on June 19, 2001, after hearing and with OCI's consent, after the Court denied confirmation of their Chapter 11 plan.

record and applicable law.  This matter is ready for decision.  This memorandum contains the Court's findings of fact and conclusions of law.

This Court has jurisdiction of this adversary proceeding under 28 U.S.C. § 1334(b).  OCI seeks denial of Defendants' discharge under §§ 727(a)(3), (a)(4) and (a)(5), which are core proceedings under 28 U.S.C. § 157(b)(2)(J).  Wrights deny OCI's allegations and seek discharge.

## AGREED FACTS

The Pretrial Order approved by parties' counsel set forth the following agreed facts:

1.  Defendants Lawrence D. Wright and Ann Marie Wright filed a joint petition under Chapter 13, Title 11 U.S.C., on May 26, 2005, in the United States Bankruptcy Court for the District of Montana.  The case was converted to Chapter 7 on motion of the Debtors on July 5, 2005.

2.  Plaintiff OCI is a creditor of the estate.

3.  As required by Bankruptcy Rule 1007(b), the Defendants signed their Schedules and Statement of Financial Affairs on or about June 29, 2005, which were accompanied by their signed declaration attesting under penalty of perjury that the information contained in their Schedules and Statement of Financial Affairs was true and accurate.

4.  On or about July 27, 2005, in Great Falls, Montana, Chapter 7 Trustee Darcy Crum conducted the meeting of creditors pursuant to 11 U.S.C. §§ 341 and 343.

5.  The Debtors were duly sworn under oath and testified in response to various questions posed by the Trustee and creditors, including OCI, regarding their Schedules and property.

6.  Defendants' Schedule A – Real Property filed on June 29, 2005, lists ownership of 31 condominium ("condo") units in St. Marie, Montana.

7.  In regard to the condo units at St. Marie, Montana, and in response to specific questions from the Trustee, and counsel for OCI, Larry testified that the Defendants "probably" still own 50 condo units instead of the 31 listed in Schedule A.

8.  Larry testified that the Defendants had either transferred or attempted to transfer 19 condo units at St. Marie (old Sea [sic] Glasgow Air Force Base located in Valley County, Montana) to an individual in Seattle, Washington.

9.  The individual is believed to be identified in the Defendants' Schedules as James G. Guerci of Seattle, WA, no specific address listed.  (Statement of Financial Affairs, p. 3, #10.)

10.  Defendants' Statement of Financial Affairs lists the date of the transfer as "2005". (Statement of Financial Affairs, p. 3, #10.)

11.  Mr. Wright testified that Guerci is "related to Ted Morris who is Quantum".

12.  Defendants' Schedule B, Line 17, reflects a "DEBT OWING FROM QUANTUM GROUP (TED MORRIS & ASSOCIATES) (REGARDING 50 CONDO UNITS AT ST. MARIE) Location:  In debtors' possession" in the amount of $1,866,638.22.

13.  In their Schedule B – Personal Property, #9, Defendants listed two Life Insurance policies.  The first, No. 10L0987440 (insured Ann Marie Wright).  The second, No. 10L0987420 (insured Lawrence D. Wright).  Both policies are listed as Conseco Life Insurance policies.

14.  On or about February 3, 2006, pursuant to this Court's Order dated January 30, 2006, OCI conducted the 2004 Examination of Defendants in Salt Lake City, Utah.  In conjunction with the Examination, OCI requested Defendants bring with them to the exam documentation of any and all life insurance policies in any form in which the life of either Defendants [sic] is insured, and the beneficiaries to those policies.

4

15.  At their 2004 Examination, Defendants produced documentation upon which information and belief appears to indicate Larry, an insurance agent, holds interests if five (5) additional policies or accounts which were not disclosed in Defendants' Schedules.  The first is an annuity account or policy issued by Life Investors Insurance Company of America, ("LI") policy number 01077399ON, the current balance of which appears to be $812.12.  The second is an LI policy, number 011851657, with a policy value of $8,605.26.  The policy documentation also indicates a loan balance of $7,733.43.  The third, fourth and fifth policies name Mr. Wright on three separate American Fidelity Life Insurance Company policies, along with three separate individuals believed to be his adult children, policy No. 349563, balance $179.24; No. 349564, balance $125.21; No. 349565 balance $125.21.

16.  On February 9, 2006, Defendants amended Schedule B, to include an interest in the form of a potential inheritance from his deceased father[3].

17.  On June 22, 2006, Defendants amended Schedules B and C "to include the listing of additional life insurance policies owned by Lawrence Wright, to claim an exemption on those life insurance policies, and in order to make Debtors' petition, schedules or statements complete and accurate."

18. [Stricken from Pretrial Order]

19.  Defendants transferred all or part of their interest in their insurance business in Great Falls, Montana, called Wright Insurance, to a former employee named Delores Collier.  Collier continues to operate the Wrights' former insurance business under the name "Solutions 4 Insurance" ("S4I").  At some point, the Wrights' insurance clients became the clients of Ms.

------

[3] Larry testified that his father died before the petition date.  Tr., p. 180.

Collier.

20.  Wrights testified at their 2004 Examination that Collier did not compensate or reimburse Wrights in exchange for their insurance business.

21.  Collier testified at her deposition that she paid Mr. Wright and Mrs. Wright in connection with the transaction up until approximately July of 2003.  Collier testified that she paid Mrs. Wright between $11,000 and $12,000 in 2003.

22.  Wrights continued to use the physical address of S4I for their own personal use until as recently as January 28, 2005, and October 19, 2005.

23.  Wrights' sworn discovery responses in this matter indicate they did not transfer any property for less than fair market value.

24.  Wrights jointly or individually conveyed the following real property:

> 1.  706 3rd Ave. N., Great Falls, Montana, to Michael B. Carlstrom on or about May 31, 2002;
>
> 2.  149 17th Ave. NW, Great Falls, Montana, to Charles S. Henry, Jr., by quit claim deed, on or about June 3, 2002;
>
> 3.  823 6th Av. S., Great Falls, Montana, to Charles S. Henry, Jr., by quit claim deed, on or about June 3, 2002.

25.  On October 19 and 20, 2006, the Defendants permitted OCI's inspection of Defendants' financial documentation located in approximately 15 file cabinets located in their son-in-law's shop building.

26.  The Defendants have produced some documentation surrounding their various 2002 real estate transfers.

## ADDITIONAL FACTS

Additional facts are taken from the testimony and exhibits admitted at trial, or the case dockets[4].

Larry testified that he and Ann have moved to Utah, where they have moved several times and housesit, and he is now basically retired. Tr., pp. 71, 72. He testified that they have acquired no real property since moving to Utah. Tr., p. 184. Prior to retirement Larry was in the insurance business and owned Wright Insurance, an insurance agency in Great Falls, from 1965 until 2003, and he testified that Wrights owned motels in Great Falls including the Sahara motel, the Wagon Wheel and the Rendezvous Motor Inn ("Rendezvous"), commercial properties, apartment buildings, rental properties, bare land and owned 500 condominiums at St. Marie, Montana, 450 of which were financed by OCI. Tr., pp. 72-74. Larry also owned an interest in a health supplement business named "EYI", which he did not remember well. Tr., p. 75; Ex. 1-1[5].

Wrights filed a Chapter 11 bankruptcy case in 1999, No. 99-43165-11, in which they scheduled total assets of about $42 million. Ex. 1-4. Larry testified that the biggest asset he had at that time was the 500 condo units at St. Marie, and they have decreased in value. Tr., p. 161. Larry testified that OCI vetoed money to remodel the 450 units for which it had financed Larry's purchase, and OCI sued Wrights and won a judgment against them for $5.8 million. Tr., p. 78. Also listed in Wrights' Chapter 11 Schedules at Ex. 1-5 are apartments at 512 Second Avenue

---

[4] The Court also considered OCI's discovery requests and Wrights' answers, which are located in the case docket at No. 36 as attachments "3" and "5".

[5] Ex. 1 is Wrights' motion to amend their Schedules A, B, D, and F in their Chapter 11 case No. 99-43165-11 to add several interests in real property, businesses, notes, stock and other assets.

7

North in Great Falls, which are listed at a market value of $600,000. Larry testified that OCI repossessed those apartments and sold them for $1 after paying $9,000 in taxes. Tr., p. 162.

**Solutions for Insurance (S4I)**

Delores Collier was secretary and office manager for Wright Insurance and Wright Properties[6] until November 2002. Tr., pp. 13, 45. Larry testified that one of Collier's duties was to keep records for him. Tr., pp. 79-80. Larry had other in-house bookkeepers before Collier, and he admits that the way he keeps records compared to the way other people keep records is "probably not real good" and "I'm not a good record keeper". Tr., pp. 125, 127.

Ex. E, F, and G, are Wright Enterprises income statements for the years 2001 through January 31, 2004, which Collier generated on her computer. Tr., pp. 67-68. Ex. B, C, and D are bank statements for the Wright Properties & Motels account for the months of January for the years 2003, 2002 and 2001, respectively, which Collier kept. Tr., p. 68. She testified that she created financial statements for Wright Insurance, and that for the first three months of 2002 Wright Insurance had income of about $50,000 per month. Tr., p. 62.

Collier testified she formed Solutions for Insurance ("FSI"), with Larry's help, in November 2002, after the Montana Secretary of State attached the bank account of Wright Insurance to collect back taxes. Tr., pp. 13-15, 16-19, 47-48; Ex. 7, 7-1, 7-2, 7-3, A. Ex. H is a letter from Wells Fargo Bank to Wright Properties & Motels advising Wrights of the attachment of $23,650.72 in funds on November 1, 2002. Tr., p. 47. Although the attached account was not in the name of Wright Insurance, Collier testified that the account was essentially a trust account,

---

[6] Wright Properties apparently is the entity through which Larry managed his motels and other real estate holdings.

which contained large deposits which customers had paid for insurance policies, and to avoid a

repeat Larry suggested creating a business entity and opening a bank account in Collier's name so

they could still have work and to protect the customers' deposits.  Tr., pp. 15, 53.  Larry

explained that after the garnishment a decision had to be made for someone to take care of the

clients who had already paid insurance premiums, and for someone to be there to help them if

they have a claim.  Tr., pp. 131-32.  He testified that Wright Insurance could not continue to

operate after the levy attached against the Wright bank account.  Tr., pp. 179-180.

Collier testified that Wrights transferred Wright Insurance to S4I, and that Collier is sole

shareholder of S4I and Wrights have no ownership interest.  Tr., pp. 18-19, 44, 55.  Collier

testified that the arrangement was only to be temporary, and she testified that no written

agreement exists for this arrangement.  Tr., pp. 15, 16, 19.  Larry agreed that he has never had an

ownership interest in S4I.  Tr., p. 179.  Collier and Larry testified that no agreement ever existed

between herself and Wrights that Collier would purchase Wright Insurance from Wrights, and

that no money went from Wright Insurance to S4I.  Tr., pp. 48, 51, 179.  Ann testified at her

2004 exam: "It was not our intention for her to end up with [the insurance business] without

reimbursing us, but that didn't happen.  She hasn't paid us anything."  Tr., p. 144.  At trial Ann

testified that she wanted to be paid by Collier for Wright Insurance, but she admitted that they

never had an agreement with Collier, and Ann did not know if Wright Insurance had a value.  Tr.,

p. 194.  Larry testified that the value of Wright Insurance consisted of  "probably me, Ann and

Delores".  Tr., p. 177.  Ann agreed that without someone working to sell insurance and to bring

in referrals, an insurance agency does not continue.  Tr., pp. 194-195.

After the transfer and formation of S4I, Collier testified that she operated S4I and

9

deposited insurance deposits into her new bank account.  Tr., p. 19.  She testified that she took

out loans to make up for the garnished funds paid on policies, but that Larry did not put any

money into S4I.  Tr., p. 54.  She testified that she performed the same tasks after the transfer to

S4I as before, that she still considered it to be Larry's business, and that her pay remained the

same for the first year.  Tr., pp. 20, 21.  She testified that she needed someone to guide her after

November 2002, and so she left Larry in control for training and advice.  Tr., pp. 20-21, 54.

Larry admitted trying to help Collier, but testified that the insurance business would have totally

disappeared if Collier had not been there.  Tr., p. 177.  Ex. 7-104 and 7-105 are handwritten

instructions and questions which Collier testified Larry sent her by fax and she answered.  Tr.,

pp. 22-23.

        Collier testified that Larry worked at S4I until July 2003, and Ann worked for the

mortgage company, and that S4I paid both Wrights for their insurance commissions.  Tr., pp. 23,

24.  Larry testified that he was an independent contractor for S4I working for commissions.  Tr.,

pp. 179, 189.  He has no written documentation of their independent contractor agreement.  Tr.,

p. 189.  Ann testified that she was a licensed insurance agent but let her license expire, and that

she referred insurance business to Wright Insurance and to S4I after the transfer, for which she

was paid commissions.  Tr., pp. 193, 194.

        In July 2003, Collier testified, she bought a new bookkeeping system to keep S4I's books,

and Wrights moved to Utah.  Tr., p. 44.  When they left, Collier testified no value existed in

Wright Insurance and it was in debt and still recovering from the garnishment by the State of

Montana.  Tr., pp. 52-53.

        Collier testified that she paid Larry a flat rate of $900, and paid Ann $600, and paid some

of their bills, and that she paid Wrights through March or April of 2004, although she stopped

paying Larry separately in July 2003 and just made out a single check for $1,500 to Ann, who

was not working for the insurance company.  Tr., pp. 24, 25; Ex. 7-66, 7-67.  Collier testified that

she paid Ann because she was a partner in the business with Larry, and because she was active as

an insurance agent.  Tr., pp. 25, 50.  S4I sent Larry a form 1099-MISC for the year 2003 in the

approximate amount of $1,988, and sent Ann a 1099 showing income in the amount of

$11,358.53.  Ex. 7-70; Tr., pp. 26-27.  Ex. 7-93 is S4I's QuickReport for the second half of 2003

showing total amounts paid to Ann ($11,358.53) and Larry ($1,922).  Collier testified that Larry

was producing commissions for the insurance business in 2002 and 2003, and S4I paid Wrights

commissions until Collier obtained an agent code of her own about July 2003.  Tr., pp. 38, 49.

After Wrights moved to Utah Larry continued to refer business to Collier, for which she paid

him. Tr., p. 49.

Collier testified that she held liens on 1 or 2 of Wrights' vehicles dated from 1993,

including liens on a Chrysler Imperial and 1992 Lincoln Towncar.  Tr., pp. 39, 40; Ex. 7-55, 7-

56.  Although the notices of lien filings indicate an amount owed to Collier, she answered "No"

when asked if Wrights owed her money.  Tr., p. 40.  She testified that Larry asked her if she

would mind placing liens on the vehicles and she agreed, but no money changed hands, there was

never any debt involved or anything in writing.  Tr., pp. 40-41.  Larry admitted asking Collier to

put liens on his vehicles to protect them from creditors.  Tr., p. 132, 133.  Collier is not listed in

Wrights' Schedules as a creditor.  She testified that the liens are not based on any note or

financial document, and she has always been willing to release the liens.  Tr., pp. 43, 44.

In 2003 checks were written on the "Wright's Ins., Prop. & Motels" checking account at

11

06-00041-RBK   Doc#: 59   Filed: 03/29/07   Entered: 03/29/07 14:30:58   Page 12 of 46

Norwest Bank Montana, N.A., to Wright Insurance in the amounts of $600, $550 and $302.15, $300 and $200. Tr., pp. 34-35; Ex. 7-4, 7-5, 7-6, 7-7, 7-8.  Collier testified that because of a printing error S4I had not obtained its own checks yet with "trust account" printed on them as she wanted, so she reordered checks and continued to use the Wright bank account when transferring money from the property account to the insurance account because of credit card payments.  Tr., pp. 34, 35.  Collier explained that when people paid for their insurance premiums by credit card they ran credit cards through the Wrights' motels credit card machine, because S4I did not have its own credit card machine, and she wrote checks on the Wright bank account to transfer money from the properties to the insurance account where it was to be applied to premiums.  Tr., pp. 35, 36.  Collier testified that she has no documentation, and knows of none, which describes her agreement to run S4I's insurance money through Wrights' motel.  Tr., p. 60.

Ex. 7-25 and 7-34 evidence similar transactions written to S4I in 2003, but not into 2004.  Tr., p. 36.  Collier testified that the checks written to S4I through the Wright properties account did not correspond to the checks S4I wrote to Wrights each month.  Tr., p, 36.  And Collier testified that the credit card premium payments made through the Wrights' property account were not money from Wright Insurance to S4I.  Tr., pp. 47-48, 56.  Eventually Collier got her own credit card machine at S4I's office for insurance and stopped using the machines at Wrights motels, sometime after July 2003.  Tr., p. 55, 56, 60.

Larry testified that they received commissions from S4I in 2002 through the first few months of 2004.  Tr., p. 179.  Ex. 7-71 shows that S4I made out a check to Ann dated February 2, 2004.  Tr., pp. 27, 28, 178; Ex. 7-71.  In addition to paying Wrights cash, Collier testified that S4I paid their insurance and household bills such as telephone and utilities, some house payments

12

and a Sam's Club bill until July 2003 when Wrights moved, and after that only paid "a few little bills". Tr., pp. 28, 50-51; Ex. 7-71, 7-73, 7-76. S4I paid Wrights' lease payments for the office which was in their name, and paid them a total of $13,280.53 for 2003, with $11,358.53 paid for Ann and $1,922 paid for Larry. Tr., pp. 30, 31; Ex. 7-93. Collier testified that S4I stopped paying Larry in March or April 2004, by which time she was running S4I herself. Tr., p. 48. Collier testified that she finally realized that S4I was actually her business when Wrights visited the office during the fall of 2004 and Larry asked her for permission to use the back office. Tr., p. 32. She testified that after April 2004 she no longer gave Larry money, although he asked. Tr., p. 48. Larry admitted that he stopped receiving commissions from S4I and stopped sending referrals. Tr., p. 181.

Collier and Larry testified that Larry and Ann kept financial documents in 15 to 18 file cabinets in the insurance office which she took over, which "contained everything" as far back as the 1960's. Tr., pp. 56, 165-166. Collier testified that "Larry kept everything", and that she never saw Larry destroy any financial records, and neither did she. Tr., pp. 56, 57, 58, 66. Larry agreed that he kept everything, but he testified that occasionally he would discard things as they became very old. Tr., p. 80.

Wrights' file cabinets eventually were moved out of the insurance office when a new owner purchased the building and wanted the file cabinets moved, and Collier was moving to a smaller office. Tr., pp. 57, 58. Under redirect examination Collier answered "no" when asked if anyone tried to organize Wrights' file cabinets and produce financial records relating to this litigation. Tr., p. 63. Larry testified that "organized" is "probably a loose term", but he agreed that he organized his files as he kept them in the ordinary course of business, though not for this

13

litigation.  Tr., pp. 80, 81.

Collier testified she never moved anything out of Wrights' file cabinets, but that Larry came in and moved the file cabinets and his three or four desks from his inner office on a Saturday, and left behind "a mess" and several full garbage bags.  Tr., pp. 63-65.  Collier testified that she does not know what the garbage bags contained, and she threw the garbage bags away. Tr., pp. 65, 66.  Larry testified that the records and file cabinets were moved to his son-in-law's shop.  Tr., p. 80.  He testified that he went through some but not all of the files and discarded old insurance files from the 70's, 80's and 90's on or about August 16, on a trial date that was vacated, before his son-in-law moved the file cabinets to his shop.  Tr., p. 81.

On cross examination Collier testified that S4I presently has no value, and that she is currently in bankruptcy.  Tr., p. 51.  She testified that she had S4I analyzed to determine its value and came up with a range in value from $0 to $5,000, but she does not think that anybody would pay her for S4I, which is simply a job at which she earns money only if she works the insurance business.  Tr., p. 52.  Larry testified that S4I probably could not be sold because the guaranteed income offered to new agents by competitors such as Farmers Insurance, Allstate and State Farm exceeds what anyone could have made if they took over Wrights' or Collier's insurance business. Tr., pp. 177, 178.

**Other Properties.**

In December 2001 Wrights conveyed a parcel of real property to Billings Holdings, LLC. Tr., p. 93, Ex. 3-1.  The property descriptions are at Ex. 3-2, 3-3 and 3-4, and appear to be that of the Rendezvous.  Larry testified that he did not know if he had a buy-sell agreement for that transaction, but that OCI probably has it because OCI raised money from hundreds of investors

14

to finance the purchase of the 450 St. Marie units, before OCI refused to remodel and market the units.  Tr., pp. 93-95.  Larry testified that Town Pump purchased the tracts described in Ex. 3 from OCI, even though Ex. 3 states the transferors as Wrights, and he testified that the money did not go through him or the property since OCI had not yet repossessed the Rendezvous from Wrights, and the transfer through Ex. 3 was done as the most expeditious manner.  Tr., p. 95. Larry testified that he did not have documentation of that transaction or did not know where it is. Tr., pp. 96-97.  He testified that the transaction shown by Ex. 3 was approved by the court during the Chapter 11 case.  Tr., p. 169.

Ex. 4 shows six (6) transfers by Wrights of properties to their attorney Gary S. Deschenes and Watts and Associates, Inc. ("Watts") in 2001 and 2002 by quit claim deeds[7].  Tr., pp. 112, 113.  Larry testified that those transfers were made to pay Deschenes for his legal fees Wrights owed in the approximate amount of $100,000.  Tr., pp. 169, 170, 188.  Larry testified that they owed Watts between $35,000 to $50,000.  Tr., p. 170.  Larry admitted that he does not have written documentation of the value of the properties deeded to Deschenes and Watts, how much was owed on them, what credit he received for them, or any terms of the transfers.  Tr., pp. 114, 189.  But Larry testified that the properties were not in good condition, with bad roofs and floors and that Deschenes and Watts had to put money into the properties to sell them.  Tr., pp. 172-173.  Larry testified that certain of the lots quitclaimed to Deschenes and Watts were foreclosed upon by Beneficial along with their home, and Deschenes and Watts did not receive any benefit from those lots.  Tr., p. 171.  Deschenes and Watts declined to take other properties from Wrights

---

[7] Deschenes advised the Court that he no longer owns any of the properties.  Pierce admitted that his reference to 4001 Huckleberry is a typographical error on his part.  Tr., p. 105.

in payment of their fees because of the poor condition of the properties, lack of value and property taxes owing.  Tr., pp. 174, 175.

At trial counsel disputed the time limit of OCI's discovery requests regarding transfers of properties, and the Court noted for the record that OCI's first discovery responses (attached to Docket No. 36 as attachment 3), interrogatory no. 3, requests information for each piece of real property transferred within 3 years of their Chapter 13 petition; and request for production no. 6 requests documents in the 3-year period prior to the petition.  OCI's attorney Pierce argued that OCI's other requests for admission no. 3 do not include a 3-year limitation and OCI did not intend for the 3 year limit to apply to all discovery requests.

Ex. 5 shows trust indentures and notes granted by Wrights to Castle Reef Services ("Castle Reef") dated May 16, 2002, including a property earlier quitclaimed to Deschenes.  Tr., pp. 115, 117.  Larry explained that the transfers in Ex. 5 were made as proof of his good faith that he would fund a store opening operation in several states known as "Team Kanga[8]", in which he and Ann each owned 15%, at a time when he expected the St. Marie project to earn him millions.  Tr., pp. 182, 189.  Larry testified that he has no other documentation explaining the transactions or repayment terms of the transfers shown on Ex. 5.  Tr., pp. 116, 118.  Larry testified that the trust indentures to Castle Reef were not given for their 15% shares listed in their Chapter 11 Schedules two years earlier.  Tr., p. 192.

Larry testified that, notwithstanding Ex. 5, he did not receive the $30,000 referenced on the trust indenture note, Ex. 5-8.  Tr., p. 181.  He testified that the trust indentures to Castle Reef

---

[8] Larry testified that Team Kanga had an arrangement with Nabisco to do grand openings in Wal-Marts.  Tr., p. 190.

16

were recorded but Wrights were not paid until later when one of the properties on Ex. 5, 823 Sixth Avenue South, was sold and Castle Reef received money and turned around and paid it to the Wrights.  Tr., p. 183.  Larry testified that he received $16,000 or $18,000 from Castle Reef, which they cashed and spent paying bills.  Tr., pp. 183, 184.

On May 31, 2002, Ann Wright conveyed the property described as 706 Third Avenue North to Michael B. Carlstrom ("Carlstrom") by warranty deed.  Tr., pp. 118, 119; Ex. 6-3. Larry agreed that he was friends with Carlstrom and that Ann worked with him.  Tr., p. 187.  The contract price for the sale to Carlstrom was $80,000, and Larry testified that he was not paid fair market value and would have continued to operate that property except for OCI's $5.8 million judgment against him.  Tr., p. 119.  Larry has no other documentation of payment terms for that sale.  Tr., p. 118.  That property was listed in the Wrights' Chapter 11 at a market value of $300,000. Ex. 1-5; Tr., p. 120.  Larry testified that the apartment building listed on Ex. 1-5 at 512 Second Avenue North with a market value of $600,000 was repossessed by OCI and sold for $1. Tr., p. 121.

Larry testified that they received $38,000 from the settlement statement, Ex. 6-4[9], by check and cashed it because of a threat of a levy, and used those funds to pay advertising, utility bills and house payments.  Tr., pp. 162-163.  Larry testified that that property had deteriorated before they sold it, and he knew of no one willing to pay more than he sold it for.  Tr., p. 173. Those funds were spent by May 2005.  Tr., pp. 164, 195.  Ann testified that the proceeds from the sale of their properties were spent, and that none was hidden or given to relatives.  Tr., p. 195.

On April 11, 2003, Wrights sold property to Mark and Jenny Griffiths, and produced a

---

[9] The exhibit is almost completely illegible.

settlement statement showing the sale price was $18,000. Tr., pp. 122, 124. The same property, 1818 10th Avenue South in Great Falls, was transferred from Larry to Charles Henry on June 3, 2002, by quitclaim deed. Tr., pp. 124; Ex. 6-2. Larry testified he has no written documentation other than those records of his real estate transactions. Tr., pp. 125, 126, 127.

Larry testified that he no longer owns any of the rental houses or apartments that he once owned, and that he did not sell any of them for less than he could have sold elsewhere. Tr., pp. 164, 173, 174. He testified that he did not have a longer period of time to market any of his properties. Tr., p. 173. Under cross examination by OCI's counsel Larry testified that he talked to many people about buying their properties, but he did not list the properties with a realtor. Tr., pp. 186, 187. Ann testified that they did not have any money to fix any of their properties up, which she admitted were in "extremely deplorable condition" and she did not believe they could have sold the properties for any more than they ultimately got. Tr., p. 196.

**Chapter 13 Case.**

The original Statement of Financial Affairs filed in the Wrights' Chapter 13 case, Ex. 2-33, item 10 "Other transfers" lists a transfer of 19 condo units to Guerci, with the explanation "no money received by Debtors. Transferred subject to liens", including OCI's. Tr., p. 82. Larry testified that at the time he filed his Schedules he believed the 19 units had been transferred and that he had signed quitclaim deeds. Tr., p. 158. Ann agreed that she understood when they filed their Chapter 13 Schedules that Larry had transferred 19 units, and found out only later that they had not been recorded. Tr., p. 194.

Larry testified that Guerci and Marv Bethea tried to take the St. Marie condos by paying the property taxes or redeeming them, but that he received a property tax statement stating that he

18

is still the owner of 50 units.  Tr., pp. 82, 83.  Larry admitted that he recalled testifying at his

2004 examination, after discussion with his attorney, that he probably had not transferred the 19

units to Guerci because it was part of an unsuccessful attempt to buy all 500 St. Marie units.  Tr.,

pp. 83, 159.  But Larry testified at trial that his statement on item 10 of a transfer of 19 units was

a true statement.  Tr., pp. 84, 158.

The Trustee noted at the § 341 meeting of creditors that the condo records showed Larry

owned 50 units, Tr., p. 160.  The Trustee filed a notice of abandonment of the 50 condo units at

St. Marie's on June 15, 2006[10], citing an unknown value of each unit "(possibly $1,000.00 per

unit)" and OCI's lien and other liens against the condos, stating the assets are burdensome and of

inconsequential value to the estate.  Notice of the Trustee's proposed abandonment of the 50

condos was sent to OCI's counsel and other creditors giving them 10 days to object.  After no

objections were filed the Court approved the Trustee's abandonment by Order entered on July 6,

2006 (Docket No. 67).

OCI filed Proof of Claim No. 28 in Case No. 05-61714-7 on June 1, 2006, asserting a

secured claim in the amount of $5,587,997.76 secured by real estate, based on a deficiency

judgment dated September 10, 2003, in Cause No.:  DV-1999-27 in Montana Seventeenth

Judicial District Court, Valley County.

Larry testified that he discovered additional life insurance policies in his records while

preparing for his 2004 exam, and brought them to the exam and amended his Schedules to add

them and claim exemptions.  Tr., pp. 184, 185.  On November 16, 2006, Debtors amended their

Schedules in the above-captioned Chapter 7 bankruptcy to add interests in business entities and

---

[10] Docket No. 65.

remove the reference to the transfer of 19 condos.  Tr., p. 77.  Larry testified that the original filing in 2005 was a last-minute late-night filing, for which he took much of the information for the Schedules from the prior Chapter 11 original petition and Schedules, without including the interests later added in the Chapter 11 by amendment, so Wrights had to amend their Schedules in the instant case to add those interests.  Tr., pp. 77, 78.

At his Rule 2004 examination in Utah OCI's counsel asked Larry if he had an accountant who has knowledge of Larry's finances and Larry answered "No".  Tr., pp. 85, 86.  Larry testified that accountant Dick Swenson ("Swenson") was not his accountant when the 2004 exam took place, and is not his accountant now because he could not pay Swenson and Swenson stopped being his accountant prior to 2000.  Tr., pp. 85, 86, 168.  Larry testified that he was last able to afford an accountant in 1998 or 1999, and that Swenson would not even review Larry's documents which Swenson had in his possession because Larry had not paid him.  Tr., p. 167.  Larry testified that he asked Swenson to go through his tax returns and prepare a statement, but Swenson would not.  Tr., p. 168.  Swenson retained some of Wrights' documentation after 2000.  Tr., pp. 187, 188.

In Utah, Wrights have been involved in businesses named "Xooma", which they dropped out of after earning a total of  $12.50, and L&A Insurance; they have also been house-sitting.  Tr., p. 86.  Larry testified that they were involved in Meadowlark, LLC, to develop some motel property but it never developed.  Tr., p. 90.  In the 1970's Larry invested money in Rocky Mountain Treatment Center, which possibly went through bankruptcy, and he testified that he did not expect to get a return from that business.  Tr., p. 92.  At the 2004 examination, Larry testified that he was questioned by OCI's counsel about the businesses in the same order in which they are

listed in Ex. 1, Wrights' amended Chapter 11 Schedules.  Tr., pp. 160-161; Ex. 1-11, 1-12.

Ann testified that she is not aware of anything purposefully left out of their Schedules, and denied lying about anything in this bankruptcy.  Tr., p. 195.  Larry denied that he has destroyed, hidden, mutilated, falsified or failed to keep any financial records that would have any bearing on his Chapter 7 bankruptcy.  Tr., p. 165.  He testified that the file cabinets contained old property transfers, and some of the transfers within the last three years, and that OCI's counsel went through the file cabinets for more than a day and was allowed to go through his attorney Deschenes' old files from Wrights' Chapter 11 case.  Tr., p. 166.  In addition Larry testified he forwarded bank statements to OCI's counsel from Utah and transferred some files from accountant Dick Swenson, including income statements and balance sheets.  Tr., p. 167.  Larry testified that he has no other documents showing the value of the real estate Wrights transferred. Tr., p. 176.

## DISCUSSION

OCI seeks denial of Wrights' discharge under three subsections of § 727(a).  Certain principles or factors are common and apply to each of OCI's claims for denial of discharge under § 727.  First, "[a] claim for denial of discharge under § 727 is construed liberally and in favor of the discharge and strictly against a person objecting to the discharge."  *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882 (9th Cir. BAP 2005) (citing *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1342 (9th Cir. 1986).  OCI seeks to shift the burden to the Debtors, but the initial burden is on OCI.  Second, the Court notes and deems it significant that the Trustee in

Debtors' Chapter 7[11] case, Darcy M. Crum, did not join and is not a party-complainant in this adversary proceeding objecting to the Debtors' discharge, and neither is the Office of U.S. Trustee, and OCI did not call the Trustee to testify regarding the Debtors' financial condition or business records, false oaths, or loss or deficiency of assets.  Finally, the Court finds, after observing Larry and Ann Wright testify under oath, that they both are credible witnesses.  *Allen v. Iranon*, 283 F.3d 1070, 1078 n.8 (9th Cir. 2002); *Anderson v. City of Bessemer*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518  (1985); *In re Taylor*, 514 F.2d 1370, 1373-74 (9th Cir. 1975); .

**I. § 727(a)(3).**

Section 727(a)(3) requires the Court grant a discharge unless

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained unless such act or failure to act was justified under all the circumstances of the case;

*Zavarelli v. Christopherson (In re Christopherson)*, 9 Mont. B.R. 54, 55 (Bankr. D. Mont. 1990).

OCI contends that the Debtors failed to preserve adequate records of their transfer of their insurance company to Collier, and failed to keep or preserve records of fourteen (14) real estate transactions between June 20, 2001, and June 3, 2002.  With respect to their transfer of Wright Insurance to Collier, OCI argues that the transfer was for no consideration (although OCI later argues that Collier later paid Mrs. Wright and paid their bills), that Wrights helped Collier form S4I to avoid attachment of Wrights' bank account, and that Wrights used a credit card machine at

---

[11] Nor was the Chapter 13 Standing Trustee Robert G. Drummond joined or called to testify.

one of their motels to process S4I's credit card payments through their bank account, without documentation. OCI argues that Wrights had several businesses and substantial assets, but failed to keep or preserve adequate records of their real estate transactions, while keeping extensive records, but produced in discovery only two settlement statements. OCI contends that Wrights had an affirmative duty to create records accurately documenting their business affairs, such as the transfers of five (5) properties to their attorney Deschenes for legal fees, six (6) deeds to Castle Reef of properties in which Debtors owned an interest and the other three (3) parcels to third parties, all "possible for less than fair market value, substantially depleting their assets", without documentation which they testified never existed. OCI argues that it is reasonable for the Court to consider Wrights' real estate transactions back to the year 2002, because they were complex and should have generated a substantial amount of records, but that Wrights failed to keep and produce documents of their real estate transactions in state court proceedings and discovery, without any explanation. OCI contends that, having shown Wrights' records are absent or inadequate, the burden of proof shifts to Wrights to show that their failure to keep adequate records was justified, and they failed their burden because of their extensive business experience, their understanding of the importance of careful record keeping and their experience with their Chapter 11 bankruptcy in 1999. Thus their discharge should be denied under § 727(a)(3).

Wrights argue that, with respect to their transfer of Wright Insurance to S4I and transfers of other properties, no agreements, written or verbal, ever existed between Collier and Wrights regarding a sale of Wright Insurance to S4I because no value remained in Wright Insurance through competition and customer loyalty. They contend that Wright Insurance could no longer

function due to creditor garnishment and S4I was simply creating a job for Collier, who is sole owner of S4I, to work the insurance clients, and that while Larry helped guide Collier he did not have any ownership in S4I and Wrights were just independent contractors of S4I. Wrights admit they helped Collier, including allowing use of Wrights' credit card machines in order to assist S4I clients, but that no monies from Wright Insurance went to S4I except for monies that actually were S4I monies from customers paying insurance premiums. Wrights cite Collier's recent bankruptcy filing as proof that there was no value to the insurance business except for the work of whichever agent ran it.

With respect to transfers of properties, Wrights argue that they produced all documents they had regarding those properties, and therefore cannot be guilty of concealing or failing to keep or preserve recorded information if no such documents existed. Wrights contend that they produced deeds and settlement statements for transfers within the 3 years as requested in discovery, and OCI cannot complain about not being given an answer to any unasked question. With respect to the transfers of 7 trust indentures to Castle Reef, Wrights argue that the evidence shows that no money was given for the transfers and they were invalid, and they later recovered $18,000 from Castle Reef from the sale of 1 of the properties and used it to live on and for Ann's medical bills. Wrights contend no additional documentation exists of which they are aware and thus they cannot be guilty of failing to produce it. With respect to other properties transferred, Wrights contend that the agreed facts are that they did not transfer property for less than fair market value, and they got the best price possible given the market and the deterioration of the properties. Wrights argue that OCI failed to offer any appraisal evidence of the properties at the time of the transfer. Finally, Wrights contend that the evidence shows that Larry kept records

since 1965 through the date of filing, and produced 16 file cabinets to OCI and several more at S4I.

Wrights accuse OCI's counsel of a sharp practice for accusing Debtors of destroying records based on an examination done prior to their ability to go through their records, and pursue the complaint when huge amounts of documentation were produced.

Based upon the testimony of Collier and the Wrights, which was not controverted, Larry "kept everything" and turned over from 15 to 18 file cabinets full of documents dating back to the 1960's to OCI. While Larry admitted that he may have been a poor record keeper, the fact is that he kept all his business records and no evidence exists in the record that he "concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information" which is necessary for denial of discharge under the language of § 727(a)(3). The uncontroverted evidence in the record is that Wrights kept all their financial records over decades, and turned over cabinets full of them to OCI's counsel, who went through them for a day and a half. No evidence exists in the record that the garbage bags full of trash left in S4I's insurance office after the file cabinets were removed, and thrown out by Collier, included or contained had any pertinent financial information, documents or records of the Debtors' financial condition or business transactions.

OCI has the burden of proof under § 727(a)(3) which is strictly construed against it as the party objecting to the discharge. *Roberts*, 331 B.R. at 882; *Adeeb*, 787 F.2d at 1342. OCI must show (1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions. *Lansdowne v. Cox (In re Cox)*, 41 F.3d 1294, 1296 (9th Cir. 1994). *Cox is*

distinguishable on the facts from the instant case because Mrs. Cox kept no books or records of any of the businesses or properties in which she had an interest, 41 F.3d at 1296, while in the instant case the uncontroverted testimony is that Larry "kept everything", and agreed fact no. 25 states that Defendants permitted OCI's inspection of Defendants' financial documentation located in approximately 15 file cabinets.

OCI offered no testimony by a representative of OCI that it even went through all of the file cabinets to which Wrights allowed OCI's counsel access.  Larry testified that OCI's counsel spent a day and a half going through the file cabinets, but no testimony from OCI exists in the record that it completed going through all of the Debtors' file cabinets and reviewing the records contained therein.

OCI cites *Matter of Juzwiak*, 89 F.3d 424, 429 (7th Cir. 1996) in support of its contention that Debtors have an affirmative duty to create books and records accurately documenting their business affairs.  On the contrary, however, *Juzwiak* demonstrates OCI's failure to satisfy its burden of proof by evidence, because in *Juzwiak* two expert accountants testified, after reviewing the debtor's records, and concluded that the debtor's records were incomplete compared with what similar clients kept.  89 F.3d at 426, 429 n.2.  In the instant case, by contrast, OCI offered no testimony by a qualified expert accountant or any other witness regarding what it found in the Debtors' file cabinets or other records, and offered no expert testimony by qualified experts in the fields of real estate transactions, sales of insurance agencies, accounting, or any other field of expertise upon which the Court could make a finding that the Debtors' records of the S4I transaction, real estate transfers, or other business transactions were not adequate.  The record includes numerous deeds, trust indentures, settlement statements, income statements and bank

statements.  OCI argues that additional buy-sell agreements, records of credits, valuations and other documentation should exist, but it offered no expert testimony in support of its argument or specifying what documents and records would be considered adequate.

OCI did not even offer testimony from a representative or employee of OCI asserting that the Debtors' records of their financial condition and business dealings are not adequate.  OCI argues in its brief that the Debtors failed to keep and preserve records and documentation of their real estate transactions and transfer of Wright Insurance to S4I, but attorney argument is not evidence.  *Hurley v. Student Loan Acquisition Auth. of Ariz., et al.*, (*In re Hurley*), 258 B.R. 15, 23 (Bankr. Mont. 2001) (An attorney's argument is not evidence); *United States v. Velarde-Gomez*, 224 F.3d 1062, 1073 (9th Cir. 2000); *Exeter Bancorporation v. Kemper Securities Group, Inc.*, 58 F.3d 1306, 1312 n.5 (8th Cir. 1995)(Statements of counsel are not evidence and do not create issues of fact), citing *United States v. Fetlow*, 21 F.3d 243, 248 (8th Cir. 1994), *cert. denied*, 513 U.S. 977, 115 S.Ct. 456, 130 L.Ed.2d 365 (1994); *In re Nielsen*, 211 B.R. 19, 22 n.3 (8th Cir. BAP 1997) (Neither statements of counsel nor exhibits to a brief are evidence unless expressly stipulated as admissible evidence).  Given OCI's burden of proof and strict construction of §727(a) against the objecting party, *Roberts*, 331 B.R. at 882, any inference by the Court regarding the adequacy of the Debtors' books and records, in the absence of qualified testimony, would be inappropriate, improper and inconsistent with the assigned burden of proof.

A leading commentator notes that "even if no books whatever are kept, if the debtor's financial condition and business transactions can be ascertained from available records and memoranda, a discharge should be granted."  6 COLLIER ON BANKRUPTCY, ¶ 727.03[3][c].  The

evidence in the record shows that voluminous records filled at least 15 file cabinets of Wrights' business transactions and real estate transfers, spanning more than three decades, which were made available to OCI. The Court deems it significant that the Trustee did not join this adversary proceeding seeking denial of the Debtors' discharge based upon § 727(a)(3). OCI did not call the Trustee to testify regarding the state or sufficiency of the Debtors' records of financial condition or business transactions. This lack of evidence weighs against OCI as the party with the burden of proof.

OCI argues that it is appropriate for the Court to look back to and beyond the three year period included in some of its discovery requests to examine Debtors' real estate transfers and business dealings. In the Court's view, a reasonable reading of OCI's discovery requests is that it requested information regarding Wrights' transfers of properties within three years of their Chapter 13 petition, and that Debtors complied with that request. The Court disagrees with OCI's counsel that its other requests for admissions without time limits properly takes the lookback period beyond three years. But it makes no difference because Larry "kept everything" and produced it for OCI to review.

Based upon the Debtors' voluminous business records, and OCI's failure to offer testimony by expert witnesses as was offered in *Juzwiak*, the Court concludes that OCI failed to satisfy the first *Cox* requirement that the Debtors failed to maintain and preserve adequate business records. Given that failure it is not necessary to consider the second *Cox* factor – whether such failure makes it impossible to ascertain the Debtors' financial condition and material business transactions, and the burden of proof does not shift to the Wrights to justify the inadequacy or nonexistence of the records. *Cox*, 41 F.3d at 1296.

28

## II.  § 727(a)(4)(A) – False Oaths.

OCI argues that Debtors' discharge should be denied under § 727(a)(4)(A) for making

four (4) false oaths in connection with their bankruptcy:  (1) that they were not involved in

certain businesses within six (6) years preceding their Chapter 13 petition; (2) that they had

transferred 19 condo St. Marie units in 2005; (3) that they did not have an accountant with

knowledge of their finances; and (4) that Wright Insurance was valueless when they transferred it

to Collier.  OCI contends that Wrights' Chapter 13 filing and 2 subsequent amendments failed to

disclose eleven business interests, and that Debtors' explanation that the failure to disclose these

businesses, particularly Team Kanga, was a mere oversight is not credible since they finally

amended their schedules four days before trial and had projected millions of dollars of income

from Team Kanga.  OCI argues that Debtors' earlier amendments to list possible inheritance and

insurance policies should have included their business interests.  OCI contends that Debtors'

reliance on their 1999 Schedules as an excuse for their 2005 Schedules' omissions is not

credible, because if they had simply transferred the assets then the Chapter13 Schedules would

have listed the business interests.  OCI argues that Debtors had no discretion but to correct

documents upon learning of inaccuracies and incompleteness.

With respect to transfers of 19 St. Marie condo units to Guerci in 2005, OCI cites

Wrights' testimony at the § 341 meeting and 2004 exam that they probably had not transferred

the units to Guerci, and argues that Wrights did not correct their Schedules in two amendments

until November 16, 2006, which OCI contends is too late and violated their obligation to cure

their false oaths.  Regarding Larry's 2004 testimony answering "No" when asked if he had an

accountant who had knowledge of his finances, OCI contends that Wrights failed to disclose the

identity of their Great Falls accountant Dick Swenson until November 16, 2006.  OCI argues that Wright's statements were intentionally and substantially incomplete and he treated his bankruptcy "like a game of cat and mouse," for which § 727(a)(4)(A) provides a necessarily harsh penalty.

With respect to Wrights' transfer of their insurance to Collier, OCI contends Wrights falsely indicated Wright Insurance was valueless and that Collier did not pay them anything, while Collier testified that Wright generated $50,000 per month in revenues and S4I covered the $25,000 loss which Wright Insurance sustained when its bank account was seized, and paid them additional funds.  Having shown 4 false oaths, OCI argues that Wrights have failed their burden of proof explaining the falsehoods or disproving OCI's allegations, and in particular accuses Mr. Wright of bending the truth in order to protect his assets from discovery by creditors.

Wrights contend that their Schedules listed 31 St. Marie condo units and the Statement of Financial Affairs lists an additional 19 units being transferred based on 19 quit claim deeds he had transferred to the potential buyer.  Wrights argue that Larry believed on the petition date that he owned only 31 units, against which OCI held judgment liens, and that OCI could have enquired with the clerk and recorder's office to find out about the matter, but is instead looking for an excuse to argue Wrights' obligation to OCI is nondischargeable.  Wrights argue that they amended their Schedules to reflect that they still own all 50 units, which were abandoned by the Trustee and have no value to the estate, and his belief on his ownership is not evidence of a knowing and fraudulent false oath.  With respect to funds they received from Collier, Wrights argue they were independent contractors and 1099's were issued to reflect their income.  Wrights contend that OCI's contentions regarding failure to list businesses they were involved in are not

30

part of Plaintiff's contentions in the pretrial order, and were not knowing and fraudulent oaths. Wrights argue that their Chapter 13 petition, like their prior Chapter 11, was an emergency filing due to state court proceedings and Mr. Wright was in Utah and used his original Chapter 11 schedules, prior to their amendment, to prepare his Chapter 13 Schedules, and their subsequent amendments listed the businesses and were used by OCI's counsel.

With respect to insurance policies, and Larry's testimony that he did not have an accountant, Wrights argue that those contentions are not in the pretrial order and are waived, and that Wrights amended their Schedules to list their interests in insurance policies. With respect to their accountant, Wrights contend that Larry's testimony was not false because they did not have an accountant with knowledge of their finances since 1998 or 1999 because they could not pay Swenson. They argue that OCI's question about their accountant "was a poor question" and OCI cannot blame Larry because its attorney failed to ask the proper question.

This Court construed § 727(a)(4)(A) in *Torgenrud v. Schmitz (In re Schmitz)*, 224 B.R. 149, 150-51, 17 Mont. B.R. 43, 44-46 (Bankr. Mont. 1999):

> The Bankruptcy Code provides that a debtor under Chapter 7 shall be granted a discharge, unless "the debtor knowingly and fraudulently, in or in connection with the case--(A) made a false oath or account...." 11 U.S.C. S 727(a)(4). Thus, to succeed on a § 727(a)(4)(A) claim, the objecting party must demonstrate that: (1) a false oath or statement was made by the debtor; (2) knowingly and fraudulently; (3) which was material to the course of the bankruptcy proceedings. *First Nat'l Bank of Crosby v. Syrtveit (In re Syrtveit)*, 105 B.R. 596 (Bankr. Mont. 1989). A false oath or statement is made when it occurs (1) in the debtor's schedules or (2) at an examination during the course of the proceedings. *Scimeca v. Umanoff*, 169 B.R. 536, 542 (D.N.J.1993); *aff'd*, 30 F.3d 1488 (3d Cir.1994). The Court in *Scimeca* noted that while the initial burden lies on the objector to prove that the debtor made a false statement in connection with the proceedings, once it "reasonably appears the oath is false, the burden falls on the bankrupt" to disprove the allegation. *Scimeca*, 169 B.R. at 542; *Kramer v. Poland (In re Poland)*, 222 B.R. 374 (Bankr. M.D.Fla 1998) ("it is well established that once the Plaintiff has

31

met the initial burden by producing evidence which establishes a basis for the objection, the Defendant has the ultimate burden of persuasion.  *See, Chalik v. Morrefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir. 1984).").

* * * *

With regard to materiality, the Eighth Circuit Court of Appeals adopted the following standard of materiality as espoused by the Eleventh Circuit Court of Appeals in *Chalik*, 916 F.2d at 484:

> The subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.

*Mertz v. Rott*, 955 F.2d 596, 598 (8th Cir. 1992). . . .  This case highlights an obvious and fundamental maxim in bankruptcy–that providing false information under oath in a bankruptcy proceeding is not a matter to be taken lightly.  *See e.g., Tully*, 818 F.2d 106, 112 (1st. Cir. 1987) (stressing that sworn statements in bankruptcy schedules "must be regarded as serious business" because "the system will collapse if debtors are not forthcoming");  *In re Nazarian*, 18 B.R. 143, 146 (Bankr. D.Md.1982) (noting that a creditor need not actually rely on the false statement).  As previously noted by this Court,

> The primary purpose of § 727(a)(4)(A) is to ensure that dependable information is supplied to those interested in the administration of the bankruptcy estate so they can rely upon it without the need for the Trustee or other interested parties to dig out the true facts through examinations or investigations.

*Bastrom*, 106 B.R. at 227.

*See also Mabank Bank v. Grisham (In re Grisham)*, 245 B.R. 65, 76 (Bankr. N.D. Tex. 2000).

This Court discussed a debtor's responsibility in completing schedules and statements of financial affairs in *Torgenrud v. Wolcott (In re Wolcott)*, 194 B.R. 477, 486 (Bankr. D. Mont. 1996):

> As to the false declarations in Wolcott's Schedules and Statement of Affairs, the preparation and filing of such documents for the Bankruptcy Court "is no idle task." *Torgenrud v. Smith* (*In re Smith* ), 14 Mont.B.R. 228, 232 (Bankr. D.

32

Mont.1995). Courts take a very dim view of the " 'intentional and fraudulent omission of property from sworn schedules [which] amounts to an offense punishable by the Criminal Code.' " *In re Woodson*, 839 F.2d 610, 614 (9th Cir.1988). "Numerous cases hold that the debtor has a duty to prepare schedules carefully, completely and accurately." *In re Mohring*, 142 B.R. 389, 394 (Bankr.E.D.Cal.1992), *aff'd mem.*, 153 B.R. 601 (9th Cir. BAP 1993), *aff'd mem.*, 24 F.3d 247 (9th Cir.1994). Moreover, a debtor must correct such documents filed with a court upon learning of their inaccuracy or incompleteness. *Id.* The debtor has "no discretion in this regard." *Smith*, 14 Mont.B.R. at 233. Furthermore, a debtor has an affirmative duty to "cooperate with the trustee in preparing a 'complete inventory of the property of the debtor.' " *Mohring*, 142 B.R. at 394. Failure to follow these precepts results in denial of a debtor's general discharge for harboring an intent to conceal property. 11 U.S.C. § 727(a)(2); *Devers*, 759 F.2d at 753-754.

In the case *sub judice*, Wolcott's actions fly in the face of the foregoing dictates. The Court identified at least six flat falsehoods contained in Wolcott's Schedules and Statements of Affairs. Furthermore, in written arguments filed with the Court, Wolcott boldly admitted to concealing from the Trustee a $45,000 asset. These flagrant violations of Wolcott's clear duty of honesty and forthrightness in the conduct of Wolcott's bankruptcy clearly demonstrate a calculated intent to conceal property. Thus, once again, even construing the evidence against Wolcott in the most lenient light, the Court finds 11 U.S.C. § 727(a)(2) altogether satisfied.

The above-quoted language demonstrates the overlap between the subsections of § 727.

All that is required for a denial of discharge under the plain language of § 727(a)(4)(A) is a single false oath or account. *Smith v. Grondin (In re Grondin)*, 232 B.R. 274, 277 (1st Cir. BAP 1999) (*citing Schmitz*). "A false oath may involve a false statement or omission in the debtor's schedules." *Fogal Legware of Switzerland, Inc. v. Wills (In re Wills)*, 243 B.R. 58, 62 (9th Cir. BAP 1999); *In re Beaubouef*, 966 F.2d 174, 178, (5th Cir. 1992).

Technically, the omitted business interests may be considered material because they bear a relationship to the bankrupt's business transactions or estate, concerns the discovery of assets, business dealings, or the existence and disposition of their property. *Schmitz*, 224 B.R. at 150-51; *Mertz v. Rott*, 955 F.2d at 598. The above analysis in *Schmitz* remains good law consistent

with the BAP's analysis of §727(a)(4) in *Wills*, 243 B.R. at 62-63, in which the BAP sets forth a

comprehensive analysis of intent and materiality thus:

> Materiality is broadly defined.   A false statement is material if it bears a
> relationship to the debtor's business transactions or estate, or concerns the
> discovery of assets, business dealings, or the existence and disposition of the
> debtor's property.   *In re Chalik*, 748 F.2d 616, 618 (11th Cir.1984).   See also *In
> re Weiner*, 208 B.R. 69, 72 (9th Cir. BAP 1997), rev'd on other grounds, 161 F.3d
> 1216 (9th Cir.1998) (citing *Chalik* and holding that a false statement is material if
> it "bears a relationship to the debtor's estate, and concerns the discovery of assets,
> or the existence and disposition of his property").
>
> A false statement or omission may be material even if it does not cause direct
> financial prejudice to creditors.   See *Weiner*, 208 B.R. at 72; *Chalik*, 748 F.2d at
> 618.   *See also In re Hoblitzell*, 223 B.R. 211, 215-16 (Bankr.E.D.Cal.1998)
> (omission of asset may be material even if it did not financially prejudice the
> estate or creditors "if it aids in understanding the debtor's financial affairs and
> transactions"); [*In re Ford*, 159 B.R. 590, 593 (Bankr. D. Or. 1993)] (omission or
> false statement may be material if it is relevant to the discovery of past
> transactions--value of omitted assets does not have to be significant to be material
> and no detriment to creditors need be shown); *In re Haverland*, 150 B.R. 768, 771
> (Bankr.S.D.Cal.1993) (applying standard set forth in *Chalik* and noting that
> materiality of false oath does not depend on whether the falsehood is detrimental
> to creditors).
>
> The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and
> creditors have accurate information without having to conduct costly
> investigations.   [*In re Aubrey*, 111 B.R. 268, 274 (9th Cir. BAP 1990)].   "[T]he
> opportunity to obtain a fresh start is . . . conditioned upon truthful disclosure."   *Id.*
> "The entire thrust of an objection to discharge because of a false oath or account is
> to prevent knowing fraud or perjury in the bankruptcy case.   As a result, the
> objection should not apply to minor errors or deviations in testimony under oath."
> William L. Norton, Jr., NORTON BANKRUPTCY LAW AND PRACTICE 2D §
> 74.11 (1997).   A false statement or omission that has no impact on a bankruptcy
> case is not grounds for denial of a discharge under § 727(a)(4)(A).   6 Lawrence P.
> King *et al.*, COLLIER ON BANKRUPTCY ¶ 727.04[1][b] (15th ed. Rev.
> 1998)(citing *In re Fischer*, 4 B.R. 517 (Bankr.S.D.Fla.1980)).   As a result,
> omissions or misstatements relating to assets having little or no value may be
> considered immaterial.   *See, e.g., In re Waddle*, 29 B.R. 100 (Bankr. W.D. Ky.
> 1983). Likewise, omissions or misstatements concerning property that would not
> be property of the estate may not meet the materiality requirement of §
> 727(a)(4)(A).   *See, e.g., In re Swanson*, 36 B.R. 99 (9th Cir. BAP 1984).

However, an omission or misstatement relating to an asset that is of little value or that would not be property of the estate is material if the omission or misstatement detrimentally affects administration of the estate.

> In determining whether or not an omission is material, the issue is not merely the value of the omitted assets or whether the omission was detrimental to creditors. Even if the debtor can show that the assets were of little value or that a full and truthful answer would not have directly increased the estate assets, a discharge may be denied if the omission adversely affects the trustee's or creditors' ability to discover other assets or to fully investigate the debtor's pre-bankruptcy dealing and financial condition. Similarly, if the omission interferes with the possibility of a preference or fraudulent conveyance action the omission may be considered material.

6 King, COLLIER ON BANKRUPTCY ¶ 727.04[1][b].

In this case, the bankruptcy court determined that the false statements and omissions in Debtors' petition were not material solely because Fogal did not show that the assets had sufficient value to increase the amount paid to creditors. Based on the above authorities, we conclude that a statement or omission relating to an asset that is of little value or that would not be property of the estate can be material if it detrimentally affects the administration of the estate. The bankruptcy court applied an incorrect interpretation of the materiality requirement of § 727(a)(4)(A). We therefore remand so that the court can apply the correct legal standard.

 b. Intent

To deny a debtor a discharge under § 727(a)(4)(A), the plaintiff must show that the debtor knowingly and fraudulently made a false oath. *Aubrey*, 111 B.R. at 274. Intent must be actual, not constructive. *In re Devers*, 759 F.2d 751, 753 (9th Cir.1985).

The issue becomes whether the Wrights acted with the requisite intent and whether any statements, if false, and any omissions were material. The businesses and assets from the Wrights' Chapter 11 case which were omitted in the Debtors' original Chapter 13 petition all involved defunct or valueless businesses, and in each instance OCI participated in and had reference to the Debtors' Chapter 11 filings, so was always aware of the existence of those

35

businesses and assets.  A court may consider the fact that an asset has little value in its determination of a debtor's intent under § 727(a)(4).  *Wills*, 243 B.R. at 64, citing *In re Mereshian*, 200 B.R. 342, 346 (9th Cir. BAP 1996).   Notwithstanding Larry's projections, the evidence does not show that Team Kanga or any of the other omitted assets had any value to the estate, just like the insurance policies later added by amendment and exempted, and the condo units which the Trustee abandoned.  In addition, OCI failed to show any evidence that the omission of the defunct and valueless business entities in any way detrimentally affected the administration of the estate.  As noted above, the Trustee has not joined OCI's action to deny Wrights a discharge for making false oaths.

As noted above Debtors must knowingly and fraudulently make a false oath.  First, the Court considers the term "fraudulently."  The requisite fraudulent intent "must be actual, not constructive".  *Wills* 243 B.R. at 64 (citing *Devers v. Bank of Sheridan (In re Devers)*, 759 F.2d 751, 753 (9th Cir. 1985)).  OCI may prove such intent through "circumstantial evidence or by inferences drawn from Wrights' course of conduct." *Id*. (citing *Devers*, 759 F.2d at 753-54). Surrounding circumstances and certain badges of fraud may establish the necessary intent.  *Wills*, 243 B.R. at 64, citing *See In re Woodfield,* 978 F.2d 516, 518-19 (9th Cir.1992).  Although *Woodfield* involves 11 U.S.C. § 727(a)(2), the analysis of intent applicable to such section applies also to 11 U.S.C. § 727(a)(4).  6 COLLIER ON BANKRUPTCY, ¶ 727.04[1][a] (15th ed. rev.). "A court may find the requisite intent where there has been a pattern of falsity or from a debtor's reckless indifference to or disregard of the truth." *Wills*, 243 B.R. at 64 (citing *Garcia v. Coombs (In re Coombs)*, 193 B.R. 557, 564 (Bankr. S.D.Cal. 1996)).

The second term "knowingly" requires Wrights to act deliberately and consciously.

36

*Roberts*, 331 B.R. at 883.  The following analysis from *Roberts*, is instructive:

> The bankruptcy court did not make a finding that Roberts acted deliberately and consciously in failing to make these disclosures until he amended his Statement. Instead, the court found that Roberts exhibited, "a careless and reckless approach to the important duty of disclosure in sworn bankruptcy filings." "Careless and reckless" is a lower standard than "knowing."
>
> An action is careless if it is "engaged in without reasonable care." *Id.* at 225. This is a negligence standard, not a knowing misconduct standard. A false statement resulting from ignorance or carelessness does not rise to the level of "knowing and fraudulent." *See, e.g., Mondore v. Mondore (In re Mondore),* 326 B.R. 214, 217 (Bankr.W.D.N.Y.2005) ("a false statement resulting from ignorance or carelessness is not one that is knowing and fraudulent").
>
> Similarly, recklessness does not measure up to the statutory requirement of "knowing" misconduct. An action is reckless if it creates, "a substantial and unjustifiable risk of harm to others [through] a conscious (and sometimes deliberate) disregard for or indifference to that risk ...." BLACK'S LAW DICTIONARY at 1298.  Since the bankruptcy court did not find that Roberts made his nondisclosures "knowingly" in the required sense, we cannot sustain the denial of his discharge.

*Roberts*, 331 B.R. at 884.  The Court notes however that "[a] reckless disregard of both the serious nature of the information sought and the necessary attention to detail and accuracy in answering may rise to the level of fraudulent intent necessary to bar a discharge."  6 COLLIER ON BANKRUPTCY, ¶ 727.04[1][a] (15th ed. rev.).  The elements of "knowingly" and "fraudulently" may not be conflated.  They each must be proven.  *See Roberts,* 331 B.R. at 885.

A  common instance of 'false oath' is when a debtor declares that the schedule of property is true and correct and it appears that the debtor has knowingly and fraudulently omitted assets from it.  But if items were omitted by mistake or upon honest advice of counsel, to whom the debtor had disclosed all the relevant facts, the declaration will not be deemed willfully false, and the discharge should not be denied because of it."  6 COLLIER ON BANKRUPTCY, ¶ 727.04[2]

(15th ed. rev.) (citing *In re Mascolo*, 505 F.2d 274, 277 (1st Cir. 1974) ("explanation by a bankrupt that he had acted upon advice of counsel who in turn was fully aware of all the relevant facts generally rebuts an inference of fraud").  OCI argues that the Wrights' omission of the business assets listed in their Chapter 11 case from their Chapter 13 Schedules was a false oath, and that Wrights' claim that it was an oversight is not credible.  The Court has found that Wrights are credible, and Larry's testimony that he prepared his Chapter 13 Schedules in emergency late-night circumstances from Utah without his records based upon the original Chapter 11 Schedules is credible.

Finally, the Court notes that Wrights amended their Schedules to include the defunct and valueless business assets.  Amendment of schedules is liberally allowed  pursuant to F.R.B.P. 1009(a), *In re Michael*, 17 Mont. B.R.  192, 198, 163 F.3d 526, 529 (9th Cir. 1998) (citing cases).  *Michael* notes: "A court may, however, deny the debtors leave to amend 'on a showing of a debtor's bad faith or of prejudice to creditors'."  *Id*. at 198, quoting *In re Doan*, 672 F.2d 831, 833 (11th Cir. 1982) (per curiam).  In the instant case OCI did not offer any evidence, argue, or prove bad faith on the part of Wrights in their amendment of their Schedules in this case to add the valueless and defunct business interests from their Chapter 11 case such as Team Kanga, and to change the number of condo units.  OCI also failed to make a showing of prejudice to creditors of allowing the amendment to add the valueless and defunct business interests.

As a result, the Court finds and concludes that OCI failed its burden under § 727(a)(3) to show that Wrights knowingly and fraudulently, in connection with the instant case, made a false oath or account by omitting business interests which were defunct or have no value and were added by amendment without a showing of Debtors' bad faith or prejudice to creditors.

The second false oath by Debtors alleged by OCI is they had transferred 19 St. Marie condo units in 2005 to Guerci.  Applying the above law to the second alleged false oath, the Court finds that OCI failed its burden under § 727(a)(3) to show that Wrights knowingly and fraudulently, in connection with the instant case, made a false oath or account by listing the 19 St. Marie condo units in 2005.  Larry testified that he quit claimed the 19 units to Guerci, and the sale fell through but he believed at the time of filing the Statement of Financial Affairs that he had made the sale.  Ann corroborated Larry's testimony.  The fact that Larry later testified that the sale had probably not gone through does not render his original statement on his Statement of Financial Affairs false.  The Court finds that Wrights are credible, and that OCI failed to show that the alleged second oath was false at the time Wrights made it on their Statement of Financial Affairs.  The Court further finds that OCI failed its burden to show that the second oath was made knowingly and fraudulently.  The Court finds that the second oath was not material, as OCI failed to show that it in any way detrimentally affected the administration of the estate.  The Trustee promptly analyzed the condos at the meeting of creditors, and abandoned all the condos due to OCI's and others' liens.  Finally, as with the valueless and defunct business interests from the Chapter 11 case, Wrights amended their Schedules in the instant case to remove the reference to the sale of 19 condos, and OCI failed to show that the amendment was in bad faith or of prejudice to creditors.

The third false oath alleged by OCI was Larry's testimony at the 2004 examination where, answering OCI's counsel's question whether he had an accountant with knowing of their finances financial affairs Larry answered "No".  OCI contends that Larry's made a false oath by failing to disclose the identity of their accountant Dick Swenson.  Debtors contend that the

question was a poor question and Larry's answer was not false.  The Court agrees that the answer to the question was not false.

Larry testified that accountant Swenson was not his accountant when the 2004 exam took place because he had stopped being his accountant prior to 2000.  Tr., pp. 85, 86, 168.  Larry testified that Swenson refused to even review Larry's documents which Swenson had in his possession because Larry had not paid him.  Tr., pp. 167, 168.  OCI did not call Swenson to testify in this matter, and offered no other evidence that Larry had an accountant with current knowledge of his finances, so Larry's testimony is uncontroverted and the Court finds it credible, and reasonable to answer "No" when asked if he presently had an accountant, when he had not had an accountant in years because he could not pay and the professional refused to provide services.

While the Court does not agree that the question was poor, OCI did not show that it asked a logical follow-up question, for example:  "Have you ever hired an accountant?".  It was Larry's oath to answer the question he was asked truthfully, and he did.  The Court finds that OCI failed its burden to show that the third alleged oath was false, or that it was made knowingly and fraudulently, or that it detrimentally affected the administration of the estate.

The fourth and final false oath alleged by OCI is that Wrights falsely indicated that Wright Insurance was valueless when they transferred it to S4I.  OCI contends that Wright Insurance was generating cash, that Collier covered the $25,000 loss from the levy on the Wright bank account, and that S4I paid Wrights after the transfer.  Based on the testimony of Larry, Ann and Collier, the Court finds that the Wrights did not knowingly and fraudulently make a false oath in connection with the case when they indicated that Wright Insurance was valueless.

Larry, Ann and Collier all testified that Collier did not pay Wrights anything for the transfer of the insurance business to S4I. Ann testified that she wanted payment from Collier for the insurance business, but that Collier did not pay them for the business. Their testimony is uncontroverted. The evidence shows that all the payments made to Wrights by S4I, and bills paid by S4I on behalf of the Wrights, were for commissions Wrights earned for insurance referrals, not in payment for the transfer of the insurance business. OCI offered no testimony by a qualified expert that Wright Insurance had any value at the time of the transfer to S4I.

Collier went into debt to make up for the $25,000 in funds levied from the Wrights' bank account, and ended up bankrupt. Although she believes that S4I has some value she has found no buyer, and Larry testified that the insurance business is unlikely to be sold because of the competitive nature of the insurance business and guaranteed income offered by the large insurance companies. S4I was just a job for Collier, as she and Larry testified, and the insurance agency had value only to the extent of the willingness of the persons involved to generate payments of insurance premiums. At the time of the transfer to S4I no evidence exists in the record that Wright Insurance had any value, and the evidence shows that the State of Montana had levied upon $25,000 in insurance premiums held in trust, possibly rendering Wright Insurance insolvent, and in any event Wright Insurance was unable to continue in business at all because of the threat of further levies on its assets. The Court finds that OCI failed its burden to show that the fourth alleged oath was false, or that it was made knowingly and fraudulently, or that it detrimentally affected the administration of the estate.

### III. § 727(a)(5).

Under § 727(a)(5), OCI argues that Debtors failed to satisfactorily explain their transfer

41

of eight parcels of real property, and their transfer to Wright Insurance to Collier.  OCI contends

that the transfers of eight Montana trust indentures in 2002 to Team Kanga, in which they owned

an interest and claimed they received no money but later received the funds from one, and their

transfers of five properties to their attorney Deschenes, are not satisfactorily explained, and

neither is their transfer of Wright Insurance to Collier which they claimed had no value but

Collier covered their debts, gave them money and considered the business only "parked" in her

name until their financial troubles blew over.  OCI argues that Wrights have not satisfactorily

explained the loss of these assets, and their insufficient explanations indicate they attempted to

conceal their assets from creditors while discharging $5 million in debt.

Wrights argue that OCI foreclosed on a property they scheduled with a value of $600,000,

which OCI sold for $1, and that OCI purchased hundreds of St. Marie condo units for $100,000,

showing that the assets did not have the value Wrights had hoped and that they did not have

assets to meet their liabilities.  Wrights argue that OCI failed to specify any other particular piece

of property in the pretrial order that they failed to explain satisfactorily its loss or what assets

were deficient.

With respect to the transfers of property to Deschenes and Watts, Wrights argue that OCI

limited its discovery requests to 3 years and those transfers should not be at issue.  Wrights argue

that OCI did nothing for years after it obtained judgment against them, and the 3-year period is

reasonable given the 1[12] year lookback for fraudulent transfers under bankruptcy law and an

---

[12] The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, BAPCPA, effective October 17, 2005, amended the 1 year lookback to 2 years.

additional 2[13] years under state law.  Wrights argue that they would have continued to operate the

properties if they did not have a $5.8 million judgment against them and were in the process of

losing everything, but they could not get anything more for the properties because of their

deplorable condition.  With respect to the trust indentures placed on certain properties for Castle

Reef, Wrights cite Larry's evidence that no consideration was given and no actual obligation was

secured by those trust indentures, which were simply a sign of good faith in a business deal that

did not come to fruition, and so Castle Reef returned monies it received to the Wrights.

Under § 727(a)(5) an objecting party bears the initial burden of proof and must

demonstrate:  (1) debtor at one time, not too remote from the bankruptcy petition date, owned

identifiable assets; (2) on the date the bankruptcy petition was filed or order of relief granted, the

debtor no longer owned the assets; and (3) the bankruptcy pleadings or statement of affairs do not

reflect an adequate explanation for the disposition of the assets.  *Ballew v. Ballew (In re Ballew)*,

18 Mont. B.R. 404, 417-18 (Bankr. D. Mont. 2000); *Huntington Center Partners, Ltd., v. Dupree

(In the Matter of Dupree)*, 197 B.R. 928, 938 (Bankr. N.D. Ala. 1996); *Farmers Nat'l Bank v.

Yokley (In re Yokley)*, 61 B.R. 198, 200 (Bankr. W.D. Ky. 1986).  Once the objecting party has

met the initial burden of proof, the burden then shifts to the debtors to provide a satisfactory

explanation for the disposition of the assets.  *Ballew*, 18 Mont. B.R. at 418; *Chalik v. Moorefield

(In re Chalik)*, 748 F.2d 616, 619 (11th Cir. 1984).  In *Ballew* the Court found that the debtor's

amendments to schedules and amended statement of financial affairs provided the requisite

information to satisfy debtor's burden under § 727(a)(5) and denied the creditor's request for

---

[13] The Montana legislature amended Mont. Code Ann. § 31-2-341, effective April 28, 2005, and amended the 2-year lookback to 4 years and amended the 1-year lookback to 2 years.

denial of discharge, "especially in light of the fact that objections to discharge are to be construed liberally in favor of the debtor and strictly against those objecting to discharge". *Ballew*, 18 Mont. B.R. at 418.

More recently in *In re Lacounte*, 342 B.R. 809, 815 (Bankr. D. Mont. 2005) this Court quoted the Ninth Circuit decision affirming this Court in *Devers v. Bank of Sheridan (In re Devers)*, 759 F.2d 751, 754 (9th Cir. 1985): "A debtor's failure to offer a satisfactory explanation when called on by the court is a sufficient ground for denial of discharge under section 727(a)(5)." Applying these principles to OCI's claim for denial of discharge under § 727(a)(5), the Court finds that OCI has failed to satisfy its burden its burden of proof.

First, as noted in *Ballew* the transfers cannot be too remote from the petition date, and most if not all of the property transfers upon which OCI bases its § 727(a)(5) claim for denial of Debtors' discharge of properties to Castle Reef and to Deschenes and Watts for payment of their fees, in this Court's view, are remote and furthermore are beyond the specific three year period of several of OCI's discovery requests. Whatever period of time OCI's other requests for admissions in discovery contemplated, OCI's requests for information about transfers of property specified within three years of the petition date, and Wrights responded.

As above, the Court deems significant the Trustee's absence from this adversary proceeding, both as a party requesting denial of discharge and as a witness which OCI failed to call in support of its § 727(a)(5) claim that Debtors failed to explain satisfactorily any loss or deficiency of assets. With respect to the particular transfers, the Court notes the uncontroverted testimony of Larry and Ann that their properties were in poor condition when they were transferred or sold, that their transfer to Deschenes and Watts of properties were in payment of

44

professional fees incurred, and that the monies returned by Castle Reef were spent prior to the date of their Chapter 13 petition.

The testimony of Larry, Ann, and Collier showed that Collier paid no money for Wright Insurance because the business had suffered a setback when $25,000 in monies entrusted to them for payment of insurance premiums were levied upon by the State of Montana, that Wrights could no longer operate their insurance business under threat of further levy, and that the value of the insurance agency is limited to the willingness of the persons involved to work and generate payment of customer premiums. OCI failed to offer any testimony by an expert that Wright Insurance had any value in a sale under the circumstances shown by the record.

OCI argues that Wrights spent decades amassing substantial wealth through a long string of business ventures, but the record shows that Larry Wright has ended up alone, in a string of bankruptcies. His valuations of Team Kanga and St. Marie condos[14] simply evaporated when those ventures did not succeed, and those optimistic valuations are not sufficient to satisfy OCI's burden of proof under § 727(a)(5). The Court finds that the Debtors provided a satisfactory explanation for the sales and transfers of their real properties and insurance business, and grants of trust indentures.

The preceding discussion covers a full quiver of objections to discharge brought by OCI in the hope of obtaining denial of Debtors' discharge under various subsections of § 727(a). But all of OCI's contentions fall short and miss the mark under each subsection of §§ 727(a)(3), (a)(4)(A), and (a)(5).

---

[14] An investigation into the history of the St. Marie condominium reveals a graveyard of investors' hopes and money.

45

## CONCLUSIONS OF LAW

1.  This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157.

2.  This is a core proceeding involving OCI's objections to discharge under 28 U.S.C. § 157(b)(2)(J) and 11 U.S.C. §§ 727(a)(3), (a)(4)(A), and (a)(5).

3.  The Plaintiff failed to satisfy its burden under its claims for denial of discharge under § 727(a)(3), (a)(4)(A), and (a)(5), which are construed liberally and in favor of the discharge and strictly against the party objecting to discharge.  *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882 (9th Cir. BAP 2005); *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1342 (9th Cir. 1986).

**IT IS ORDERED** a separate Judgment shall be entered for the Defendants/Debtors Lawrence D. Wright and Ann Marie Wright, deceased, and against Plaintiff Olympic Coast Investment, Inc. ("OCI"); and Plaintiff's complaint filed in this adversary proceeding objecting to the Debtors' discharge under 11 U.S.C. §§ 727(a)(3), (a)(4)(A), and (a)(5) will be dismissed.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

46